FILED
03/27/2019
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 14, 2018 Session

## STATE OF TENNESSEE v. DONALSON WELLS CARTER, AKA DONALDSON W. CARTER

**Appeal from the Criminal Court for Davidson County**
No. 2017-A-9     Steve R. Dozier, Judge

_____

**No. M2017-02057-CCA-R3-CD**

_____

The Defendant, Donalson Wells Carter, was convicted of the sale of fentanyl, simple possession or casual exchange of fentanyl, possession with intent to sell or deliver 0.5 grams or more of cocaine, and possession with intent to sell or deliver 0.5 grams or more of methamphetamine. He received an effective sentence of thirty years. The Defendant raises three issues on appeal, arguing that: (1) the trial court erred by allowing the State to introduce evidence of prior bad acts; (2) the trial court erred by failing to require the State to disclose favorable treatment of witnesses; and (3) his sentence is excessive. Upon reviewing the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Manuel B. Russ (on appeal) and Justin Johnson (at trial), Nashville, Tennessee, for the Appellant, Donalson Wells Carter, aka Donaldson W. Carter.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Glenn Funk, District Attorney General; and Jenny Charles and J. Wesley King, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

**Trial**

On January 11, 2016, detectives working for the Metro Nashville Police Department in the Hermitage Crime Suppression Unit were surveilling a Walmart parking lot, a known "hot-spot" for the sale of narcotics. While surveilling the parking lot, Detective David Harper, the lead detective on this case, observed the Defendant's car circle the parking lot at least two times prior to parking in the fire lane. Detective Harper observed a white woman, who appeared to be in her thirties, enter the passenger side of the Defendant's vehicle. Detective Harper testified that the upper body movements of the driver and the passenger "suggested that they were interacting and exchanging an item."

Ms. Summer Sullivan testified that on January 11, 2016, she and Ms. Candice Strang made plans to purchase heroin at the Walmart parking lot. Ms. Sullivan testified that she purchased 0.5 grams of heroin from the Defendant for one hundred dollars and that she was not aware that the substance was fentanyl, an extremely potent opioid, instead of heroin. She also testified that she attempted to sell a .25 caliber handgun to the Defendant but that the Defendant declined to purchase it. Upon returning back to Ms. Strang's car, Ms. Sullivan removed the powdered substance from the bag so that she and Ms. Strang could use the drug they both believed to be heroin, not fentanyl. While Ms. Sullivan was holding the bag, one of the officers reached through the open window and grabbed it.

Ms. Sullivan's child was in the car when the officers approached. Ms. Sullivan was arrested and charged with aggravated child neglect, possession of a Schedule I controlled substance with intent to resell, and possession of a weapon during the commission of a dangerous felony. Ms. Strang was also charged with aggravated child neglect and possession of a Schedule I controlled substance. The charges that Ms. Strang and Ms. Sullivan were facing were later dismissed.

On cross-examination, Ms. Sullivan testified that she had initially contacted the Defendant because she wanted to sell him a gun and not to purchase heroin. She admitted that at the time of her arrest she did not tell the officers that she was merely trying to sell the Defendant a gun. She acknowledged that she was currently serving an eight-year sentence for a charge unrelated to the present case and that she had two pending theft charges. Ms. Sullivan admitted that she had been addicted to heroin for over two years.

Ms. Sullivan denied that the State made any promises to her in exchange for her testimony at trial, and she agreed that the prosecutor had revoked her bond when she was charged with additional offenses. She agreed that she had first met the prosecutor the previous week and testified that no one from the prosecutor's office had made her any promises in exchange for her testimony. Ms. Leah Wilson, Ms. Sullivan's attorney,

testified that the district attorney's office never made a firm offer to reduce Ms. Sullivan's sentence in exchange for her testimony in the present case.

Ms. Strang testified that she and Ms. Sullivan made plans to purchase drugs that day. Ms. Strang maintained that she did not know from whom Ms. Sullivan planned to purchase the drugs. Ms. Strang stated that she recognized the Defendant's car in the WalMart parking lot because she "had purchased drugs from him for six, seven months before I got clean in September."

On cross-examination, defense counsel asked Ms. Strang how she knew the Defendant, and she again testified that she had been purchasing drugs from him for approximately six to seven months. Ms. Strang further testified that Ms. Sullivan "always got heroin[] from him." Ms. Strang stated that she was not aware that Ms. Sullivan was trying to sell a gun to the Defendant. Ms. Strang said the reason that she and Ms. Sullivan went to Walmart was to shoplift and then sell the goods so that they would have money to purchase heroin. She testified that she attempted to use the heroin as soon as Ms. Sullivan returned to the car.

Detective Conrad Straub and Detective Jimmy Gregg were also surveilling the parking lot from their police vehicles. Detective Straub testified that he observed Ms. Sullivan enter the passenger side of the Defendant's car and remain in the car for approximately two to three minutes. Detective Gregg observed Ms. Sullivan enter the Defendant's car upon exiting Walmart. Detective Gregg stated that when he questioned Ms. Sullivan, she said the man in the Dodge Charger sold her the drugs, but she did not mention the Defendant by name. Detective Gregg seized the drugs from Ms. Strang's car and later placed them in the property room.

After Ms. Sullivan exited the Defendant's car, the Defendant drove out of the parking lot. Detective Harper followed the Defendant and conducted an investigative stop. After Detective Harper asked the Defendant to go to the back of the car, the Defendant stated, "You guys keep f***ing it up for me." Detective Harper searched the Defendant's car and found over $1,300 in cash. Detective Harper found multiple plastic bags containing controlled substances on the Defendant's person. Detective Harper conducted a field test of the different substances found in the plastic bags. The field tests revealed methamphetamine, crack cocaine, and heroin.

Mr. Timothy Akin, a forensic scientist at the Metro Nashville Police Department Crime Lab ("Nashville Crime Lab"), was accepted by the trial court as an expert in the field of forensic chemistry. Mr. Akin testified that there were four items in two different evidence bags that were submitted for testing. One substance tested positive for methamphetamine and weighed 0.5344 grams. Another substance tested positive for

crack cocaine and weighed 3.37 grams. The last substance, which tested positive for heroin during the field test, tested for positive for fentanyl and acetyl fentanyl. The substance found in the possession of Ms. Sullivan and Ms. Strang also tested positive for fentanyl and acetyl fentanyl. On cross examination, Mr. Akin explained that the Nashville Crime Lab does not test purity levels, meaning he could not provide the percentage of fentanyl within in the substance, only that the substance contained fentanyl.

Lieutenant William MacKall was accepted by the trial court as an expert in the field of narcotics investigations. He testified that a gram of heroin is typically sold for approximately one hundred and fifty dollars. Lieutenant MacKall also stated that in many cases when fentanyl is sold "it's sold as heroin[]." He believed that often times people who purchase heroin are not aware that the substance they purchase also contains fentanyl. He also testified that if fentanyl and heroin are mixed together, the field test often will render a positive result for heroin.

The Defendant did not offer any proof. The jury returned a verdict finding the Defendant guilty of selling fentanyl, possession with intent to sell or deliver 0.5 grams or more of cocaine, and possession with intent to sell or deliver less than 0.5 grams of methamphetamine, and simple possession or casual exchange of fentanyl, a lesser included charge of the indicted offense of possession with intent to sell.

### Sentencing Hearing

At the sentencing hearing, the State called Chief Frederick Smith, who provided training in emergency medical services, as a witness. Chief Smith testified that he was trained to administer liquid fentanyl in cases where an individual has suffered a serious traumatic injury, such as an amputation. Chief Smith testified that fentanyl in the powered form is extremely dangerous and that:

> If the wind is blowing or if it is thrown into the air it can aerosolize and if individuals are standing around it they could breathe it in as in any chemical, biological particle, entering any of those substances in through our lungs is a primary way for us to be able to get it systemically through into our bodies.

Fentanyl in the powder form can also cause respiratory depression just from making contact with an individual's skin.

On cross-examination, Chief Smith stated that he did not know from experience the amount of fentanyl that a person would need to come into contact with to cause

- 4 -

respiratory problems. He testified that based on his research that as little as two or three milligrams on one's skin would cause respiratory problems.

Ms. Emily Bright, a forensic scientist who works in the drug identification unit at the Nashville Crime Lab, complied statistics of all the cases that the Nashville Crime Lab processed from May 15, 2015, to May 16, 2017. She testified that from May 15, 2015, to May 15, 2016, there were ten confirmed cases where fentanyl was present. From May 16, 2016, to May 16, 2017, there were twenty-one cases where fentanyl was present.

Officer Adam Reed testified that he arrested the Defendant on October 9, 2015, following a control buy. Officers found approximately twenty oxycontin pills, heroin, cocaine, and various other pills on the Defendant's person. The lab results of one of the substances tested positive for both heroin and fentanyl.

Detective Harper also testified at the sentencing hearing about a previous encounter with the Defendant. On October 21, 2015, Detective Harper arrested the Defendant for possession with intent to sell or deliver heroin and cocaine. During that encounter, the Defendant had a large amount of drugs on his person and cash in excess of four thousand dollars. While the Defendant was out on bond for those charges, Detective Harper arrested the Defendant for the current charges. On cross-examination, Detective Harper stated that in the prior incident, the drugs found did not contain fentanyl.

Ms. Sullivan also testified for the State at the sentencing hearing. She stated that she had known the Defendant for approximately two years and during that time she had not known him to have a job other than selling narcotics. Ms. Sullivan stated that the Defendant had money for multiple cars and that all his money came from selling drugs. She admitted that she would often buy heroin from the Defendant. On cross examination, Ms. Sullivan acknowledged that she had a sexual relationship with the Defendant. She admitted that she was an addict who purchased drugs every day.

The State argued the trial court should enhance the Defendant's sentence because the nature and circumstances of fentanyl combined with the nature and circumstances surrounding this case show that the Defendant "had no hesitation about committing a crime when the risk of human life was high." T.C.A. § 40-35-114(10). The State pointed out the particular dangers surrounding this particular sale of fentanyl. Specifically, the State argued that the fentanyl was packaged in the corner of a torn baggie, the fentanyl could have easily been dispersed in the Walmart parking lot and combined with the extreme potency of fentanyl providing a factual scenario where it is proper to enhance the Defendant's sentence.

The Defendant focused his argument on the fact that the percentage of fentanyl contained in the substances found in Ms. Strang's car and the Defendant's possession is unknown. The trial court interrupted defense counsel and stated, "I mean, you are not trying to argue that if these young girls had used the substances they would both be dead?" The Defendant responded that it is not possible to know what the outcome would have been because there was never any evidence presented about the amount of fentanyl present in the powdered substance.

The trial court considered the presentence report when imposing its sentence. The Defendant's presentence report detailed the Defendant's criminal history. The trial court determined that the Defendant had three prior felony convictions and two prior misdemeanor drug convictions. Additionally, the trial court noted that the Defendant had two pending drug sale charges in other jurisdictions.

The trial court applied two enhancement factors to the Defendant pursuant to Tennessee Code Annotated sections 40-35-114(1), (10). The trial court found that the Defendant had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range." T.C.A. § 40-35-114(1). The trial court applied this enhancement factor to all of the Defendant's sentences. The trial court also found that the Defendant "had no hesitation about committing a crime when the risk to human life was high." T.C.A. § 40-35-114(10). The trial court applied this enhancement factor to the Defendant's sentences for the sale of fentanyl and simple possession or casual exchange of fentanyl. The court relied on Chief Smith's testimony that "fentanyl, in powder form, is fifty (50) times more potent than heroin and one-hundred (100) times more potent than morphine." The trial court did not find any mitigating factors. Accordingly, the trial court sentenced the Defendant to a ten-year sentence for the sale of fentanyl, an eleven-month-and-twenty-nine-day sentence for simple possession of fentanyl, a twenty-year sentence for possession with the intent to sell cocaine, and a twenty-year sentence for possession with intent to sell methamphetamine. The trial court ordered the Defendant to serve the sentences for the sale of fentanyl and the possession with the intent to sell cocaine consecutively based on the findings that the Defendant was a professional criminal and that he had an extensive criminal record, for an effective sentence of thirty years. T.C.A. §§ 40-35-115(b)(1)-(2). The Defendant now appeals.

## ANALYSIS

The Defendant raises three issues on appeal. First, he argues that the trial court erred by allowing the State to introduce evidence in violation of Tennessee Rules of Evidence. Second, he argues that the trial court erred by failing to require the State to disclose favorable treatment of witnesses. Third, he maintains that the trial court erred in

imposing a thirty-year sentence by improperly enhancing his sentence and ordering consecutive sentencing.

## I. Admissibility of Ms. Strang's Statements

The Defendant argues that the trial court erred in allowing testimony regarding his participation in prior drug transactions. The Defendant filed several motions in limine prior to trial which he described as his "standard motions," including one requesting that the trial court conduct a jury-out hearing before the State introduced any character evidence or evidence of other criminal offenses at trial. During a pretrial hearing, the parties did not discuss Ms. Strang's potential testimony; instead, the State noted that defense counsel had indicated he might introduce evidence that the Defendant was acting as a confidential informant, and that if the defense did so, the State would seek to admit evidence that the Defendant started working as a confidential informant after a drug-related arrest. The trial court entered an order granting the Defendant's motion.

The prosecutor's opening statement included a declaration that the State anticipated that Ms. Strang would testify that she recognized the vehicle as belonging to the Defendant. During the State's direct examination of Ms. Strang, the State asked, "[W]ell, had you ever seen this car before?" Ms. Strang responded, "I had purchased drugs from him for six, seven months before I got clean in September." The Defendant did not object, and the State did not question Ms. Strang further about the prior drug transactions during direct examination. On cross-examination, the following exchange occurred:

> Q. Okay. Do you even know this man? Have you ever met him person to person?
>
> A. Yes, sir
>
> Q. Where?
>
> A. I know him through [Ms. Sullivan]. Like I said, I purchased for about six or seven months before I got clean.
>
> Q. From him?
> A. Yes sir
>
> Q. And where would that have been?
>
> A. [Ms. Sullivan]'s mom's house most of the time.

Q. Are you saying that you purchased from him then. Did you tell the police that?

A. I don't recall what I told the police.

On redirect examination, the State questioned Ms. Strang about what she had purchased from the Defendant in the past. Ms. Strang said that she had previously purchased heroin and Opana, a type of prescription pill, from the Defendant. On recross-examination, defense counsel questioned Ms. Strang about how many times she had purchased drugs from the Defendant as well as the last time she purchased drugs from him. After Ms. Strang's testimony, the trial court adjourned until the next morning.

Before the first witness was called the following morning, defense counsel moved for a mistrial, arguing that the State violated the trial court's order on the motion in limine regarding the Defendant's character and past criminal history. Defense counsel acknowledged that he failed to make a contemporaneous objection but argued that he did so "because I thought it would bring more attention to the problem than bringing it up today." The trial court asked defense counsel why he continued to question Ms. Strang about previously purchasing drugs from the Defendant. Defense counsel responded that at the time, the jury had already heard her testimony on direct examination and that, based on interviews with the Defendant, he believed the Defendant did not know Ms. Strang and had never sold drugs to her. The trial court denied the Defendant's motion for a mistrial, finding that the Defendant failed to make a contemporaneous objection and, instead, proceeded to delve into Ms. Strang's prior drug transactions with the Defendant.

The Defendant argues that the trial court erred by allowing Ms. Strang's testimony regarding her prior interactions with him to be entered into evidence. He relies on the trial court's order granting his motion in limine. The State maintains that the Defendant has waived this issue for the purposes of appellate review because the Defendant did not object, nor did he request a hearing out of the presence of the jury, as was required by the trial court's order. Instead, defense counsel continued questioning Ms. Strang and elicited additional details regarding the prior drug transactions.

Tennessee Rule of Evidence 404(b) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside of the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Rule 404(b) itself directs the trial court, upon request, to hold a hearing outside of the presence of the jury. *See State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012). This rule "is based on the recognition that such evidence easily results in a jury improperly convicting a defendant for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial." *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994) (citing *Anderson v. State*, 56 S.W.2d 731 (Tenn. 1933)). However, "[n]o matter how carefully the State prepares its trial witnesses, there will doubtlessly be occasions on which, through no fault of the State, a witness will mention a prior crime or bad act that was committed by the defendant." *State v. Curtis Keller*, No. W2012-01457-CCA-R3-CD, 2013 WL 6021332, at *17 (Tenn. Crim. App. Aug. 6, 2013), *remanded on other grounds* (Tenn. Feb. 11, 2014). Further, this court has stated that to declare a mistrial "in every such case is unwarranted and would soon bring the wheels of justice to a grinding halt." *Id.*

The State did not seek to elicit testimony about Ms. Strang's prior drug transactions with the Defendant. Rather, as defense counsel acknowledged at the time, Ms. Strang's response regarding the prior drug transactions was not responsive to the question asked by the State. Defense counsel did not object when Ms. Strang initially gave such testimony and only exacerbated the situation by asking Ms. Strang more specific questions on cross-examination regarding her prior interactions with Defendant.

This court has previously determined that when defense counsel failed to request a jury-out hearing based on a Rule 404(b) objection, the defendant waived the argument under Rule 404(b). *See State v. Undray Luellen*, No. W2009-02327-CCA-R3-CD, 2011 WL 2557010, at *5 (Tenn. Crim. App. June 27, 2011). It is undisputed that in the present case, the Defendant neither objected nor requested a jury-out hearing when Ms. Strang testified about her previous drug transactions with the Defendant. Further, the Defendant asked numerous questions elaborating on Ms. Strang's prior transactions with the

Defendant.  The Defendant has waived this issue, by failing "to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."  Tenn. R. App. P. 36(a).

Although the Defendant failed to object to the testimony or to request a jury-out hearing on it, he did move for a mistrial the next day.  The Defendant argues that the trial court erred in refusing to grant his motion for a mistrial.  This court reviews a trial court's decision concerning a motion for a mistrial under an abuse of discretion standard.  *State v. Johnson*, 401 S.W.3d 1, 22 (Tenn. 2013).  A trial court abuses its discretion when it "applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party."  *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010).

A trial court should declare a mistrial "only when there is a 'manifest necessity.'" *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996) (quoting *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)).  "'In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did.'"  *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004) (quoting *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)).  A mistrial should be declared "to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict."  *Williams*, 929 S.W.2d at 388.  The Defendant bears the burden of establishing that there was a manifest necessity for a mistrial.  *Id*.

In determining whether a mistrial is necessary after a witness has testified about a defendant's prior bad acts, this court has often considered: "(1) whether the improper testimony resulted from questioning by the state, rather than having been a gratuitous declaration, (2) the relative strength or weakness of the state's proof, and (3) whether the trial court promptly gave a curative instruction."  *State v. Demetrius Homes*, No. E2000-02263-CCA-R3-CD, 2001 WL 1538517, at *4 (Tenn. Crim. App. Nov. 30, 2001) (citing *State v. Mounce*, 859 S.W.2d 319, 322 (Tenn. 1993); *State v. William Dotson,* No. 03C01-9803-CC-00105, 1999 WL 357327, at *4 (Tenn. Crim. App. June 4, 1999)).  The trial court did not abuse its discretion in refusing to declare a mistrial.  The State did not elicit the testimony; instead, the witness volunteered that she recognized the Defendant's car from prior drug transactions.  After Ms. Strang testified about previously purchasing drugs from the Defendant, the State did not ask any further questions delving into that subject.  It was defense counsel who proceeded to delve into the Defendant's prior bad acts in his cross-examination of Ms. Strang.  There was an overwhelming amount of other evidence against the Defendant, including the fact that when he was arrested he was in possession of three different types of narcotics.  Further, defense counsel made the decision not to ask for a curative instruction.  Accordingly, we conclude that the trial court did not err in refusing to grant a mistrial in this case.

## II. Disclosure of Favorable Treatment of a Witness

The Defendant argues that the State failed to disclose alleged favorable treatment of Ms. Sullivan and Ms. Strang. The State maintains that the witnesses did not receive leniency and that there was no evidence presented that showed there was any sort of arrangement made in exchange for the witnesses' testimony.

The Fourteenth Amendment's Due Process Clause as well as article I, section 8 of the Tennessee Constitution guarantees that every criminal defendant is entitled to a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). A defendant is entitled to evidence of an agreement or promise of leniency given to the witness in exchange for favorable testimony. *See State v. Sayles*, 49 S.W.3d 275, 279 (Tenn. 2001). A defendant has the right to examine witnesses to impeach their credibility or establish bias, including exposing any promises of leniency or any other favorable treatment offered to the witness. *Id.* (citing *State v. Smith*, 893 S.W.2d 908, 924 (Tenn. 1994)).

The non-disclosure of leniency given to a witness in exchange for testifying may justify a new trial, regardless of the good or bad faith of the prosecutor. *Williams*, 690 S.W.2d at 525 (citing *Giglio v. United States*, 405 U.S. 150, 153-54 (1972)). In *Williams*, our supreme court concluded that when "the record is devoid of any evidence that plea negotiations had in fact taken place or that the State offered anything in exchange for a guilty plea" there has been no due process violation. *Id.* During the pretrial hearing, defense counsel stated "I have no proof" regarding his claim that the State had made an agreement with Ms. Strang and Ms. Sullivan. Despite not having any concrete proof, the Defendant argued that the fact that both witnesses had charges that were reduced or dismissed suggested that they received leniency in exchange for their testimony.

During the cross-examination of Ms. Sullivan, defense counsel asked "were you ever told that if you did not testify, you would be looking at getting at least a four year sentence out to those misdemeanors?" Ms. Sullivan responded by stating that she "was told there was a possibility that that could happen," that she could receive a reduced sentence on her pending charges. She also testified that the State did not threaten to remove her daughter from her custody if she refused to testify. Ms. Sullivan stated that it was her decision to testify. It is undisputed that both Ms. Sullivan's and Ms. Strang's charges related to this case were later dismissed. The dismissal of the charges occurred prior to their testimony in the Defendant's trial.

The trial court found that, contrary to defense counsel's contentions, Ms. Sullivan did not testify during trial that she had been given promises in exchange for her testimony. The trial court noted that Ms. Sullivan did not agree to testify against the Defendant until shortly before trial, after many of the charges against her had been

dismissed.  The record shows that the Defendant was given an opportunity to cross-examine witnesses regarding any leniency the State may have offered.  Both Ms. Strang and Ms. Sullivan testified that the State did not promise to reduce their sentences in exchange for their testimony.  Further, Ms. Sullivan's attorney also testified that the State had not made any promises in exchange for her testimony.  We conclude that the Defendant has not shown a due process violation because he has failed to establish there was an agreement between the State and the witnesses.  The trial court committed no error.

### III. Sentencing

The Defendant challenges the length of his sentences and the trial court's decision to impose partial consecutive sentences.  This court reviews challenges to the length of a sentence under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentences that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 830 S.W.3d 682, 707 (Tenn. 2012).  A sentence will be upheld "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statue. *Id.* at 709-10.  A sentence is not invalidated just because the trial court misapplies an enhancement factor. *Id.* at 706.  A sentence that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute." *Id.*  The appealing party bears the burden of proving that the sentence is improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

The Defendant argues that trial court abused its discretion by applying Tennessee Code Annotated section 40-35-114(10) that he "had no hesitation about committing a crime when the risk to human life was high" solely because one of the controlled substances he was convicted of possessing and selling was fentanyl.  The State responds by arguing that the evidence presented at the sentencing hearing showed that fentanyl imposes a particularly high risk to human life.  The Defendant argues that this court should rely on our precedent in which we found that a trial court could not enhance a defendant's sentence based on the "content and nature" of the substance involved. *See State v. Keel*, 882 S.W.2d 410, 419-22 (Tenn. Crim. App. 1994) (determining the trial court committed error when it enhanced the defendant's sentence based on the fact that crack cocaine posed a particular danger to human life); *State v. Marshall*, 870 S.W.2d 532 (Tenn. Crim. App. 1993), *overruled on other grounds by State v. Carter*, 988 S.W.2d 145 (1999).  All of the opinions the Defendant relies on were decided prior to the amending of the Sentencing Act in 2005.  The legislature amended the Sentencing Act to state that "the court shall consider, but is not bound by the following advisory sentencing guidelines." T.C.A. § 40-35-210(c)-(d) (2010).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. *See* T.C.A. § 40-35-114; *see also Bise*, 380 S.W.3d at 704. It is within the trial court's sound discretion to apply enhancement factors, as well as to determine how much weight should be afforded to the various enhancing and mitigating factors. *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). When imposing a sentence, trial courts must consider the evidence presented at the trial and sentencing hearing. T.C.A. § 40-35-210. The State presented evidence of the inherent dangers of fentanyl and the particular dangers surrounding the present case. The State focused on several key facts including: the location of the transaction, the presence of a child, the dangers of powdered fentanyl being blown in the wind, and the fact that powdered fentanyl did blow in the wind endangering an officer. In issuing the sentencing order, the trial court relied on Chief Smith's testimony regarding the extreme dangers of fentanyl when imposing the Defendant's sentence. We agree with the trial court that the circumstances surrounding the Defendant's sale of fentanyl, instead of mere possession of fentanyl, imposed a particularly high risk to human life.

Regardless, our supreme court has determined that "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the [Sentencing Act]." *Bise*, 380 S.W.3d at 706. The court further stated that "[s]o long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." *Id.* The trial court considered the criteria set out in the Sentencing Act, conducted relevant findings that were supported in the record, and imposed a sentence within the Defendant's appropriate range. The trial court found that the Defendant is a Range II offender, and the Defendant did not challenge this finding. A sentence that falls within the appropriate sentencing range and adheres to the purposes and principles of the Sentencing Act should be upheld. *Id.* at 706. The trial court found that the Defendant's previous criminal history, including three felony convictions and two prior misdemeanor drug convictions, supported sentencing the Defendant to the maximum within-range sentence pursuant to Tennessee Code Annotated section 40-35-114(1). The trial court did not abuse its discretion in sentencing the Defendant.

The Defendant also asserts that the trial court erred when it ordered that his sentences be served consecutively. The trial court has the sound discretion of determining whether a sentence should be served concurrently or consecutively. *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013). A trial court's decision to impose consecutive sentencing is reviewed under an abuse of discretion standard with a presumption of reasonableness. *Id.* A trial court is permitted to impose consecutive sentences when it provides reasons on the record that establish one of the seven factors enumerated in Tennessee Code Annotated section 40-35-115(b). *Id.* Here, the trial court

- 13 -

found two of the factors enumerated in Tennessee Code Annotated section 40-35-115(b). The trial court determined that the Defendant is a "professional criminal who has knowingly devoted [his] life to criminal acts as a major source of livelihood." T.C.A. § 40-35-115(b)(1). The trial court accredited Ms. Sullivan's testimony at the sentencing hearing that "the Defendant relied solely on selling drugs as income for one and a half years." The trial court noted in its sentencing order that the pre-sentence report showed that the Defendant had failed to obtain a full time job since his release from incarceration in 2011. The trial court also found "[t]he defendant is an offender whose record of criminal activity is extensive." T.C.A. § 40-35-115(b)(2). The trial court clearly articulated its reasons in conformity with the statute; therefore, we conclude that the trial court's decision to impose partial consecutive sentences was not an abuse of discretion.

## CONCLUSION

Based on the foregoing, we affirm the judgments of the trial court.

_____

JOHN EVERETT WILLIAMS, PRESIDING JUDGE